TORBERT, Chief Justice.
Petition for certiorari was granted on the issue of whether the Court of Criminal Appeals, 389 So.2d 950, erred in affirming the trial court, which allowed into evidence petitioner’s inculpatory statement made without his having first been given the Miranda[1] warnings, i. e., whether the Court of Criminal Appeals’ decision was in conflict with the decisions of Kelly v. State, 366 So.2d 1145 (Ala.Cr.App.1979), and Harrison v. State, 358 So.2d 763 (Ala.1978).
This case arose from a heated domestic dispute during which petitioner discharged his gun in the general direction of his former wife and her brother, wounding his former wife and killing her brother, Melvin Hunter. Officer Dennis Wooten of the Huntsville Police Department received a radio dispatch concerning the homicide. He saw a vehicle matching the description of the vehicle in which defendant had left the scene of the homicide (according to the radio dispatch) and pulled that vehicle off the road.
On August 27, 1979, the petitioner was convicted in the Circuit Court of Madison County on a charge of second degree murder. Petitioner appealed that conviction, alleging that it was error for the trial court to admit into evidence over his objections certain testimony relevant to a gun which was alleged to be the gun with which petitioner shot Melvin Hunter, because no Miranda warnings had been given petitioner prior to questioning. The Court of Criminal Appeals affirmed the rulings of the trial court on January 22, 1980, holding that Miranda warnings need not precede the questioning of petitioner because that questioning was not a custodial interrogation. “[Wjhere there is no dispute about the facts, this court may go to the record for a complete understanding of questions treated in the opinion of a court of appeals.” Life Insurance Company of Georgia v. Miller, 292 Ala. 525, 296 So.2d 900 (1974). Officer Wooten’s testimony in pertinent part is as follows:
A. He didn’t stop right away, so I turned my siren on and got his attention and at the top of the hill there at Winchester, between Blue Springs and I believe the first street there is Ortega Circle, he did pull over to the side of the road-it was two-lane- and I pulled up approximately ten feet from him, leaving my left front headlight on his door so that I could observe him. I dismounted my vehicle and I automatically put my shotgun in my hand, feeling that he was possibly armed. In the description we had learned that he was possibly armed with a weapon.
Q. Did you go up to the vehicle?
*954 A. At that time I dismounted my vehicle and his door came open. His left foot touched the ground, but he didn’t dismount the vehicle.
Q. Did you tell him to dismount?
A. Yes, sir, I did.
Q. Did he immediately dismount?
A. No, sir, he didn’t.
Q. What did he do, if anything?
A. His foot turned to the right, his left foot did, which was still on the ground, but didn’t dismount. I then again told him to dismount, at which time he slowly came out of the vehicle.
Q. What happened then?
A. I had him to lie down, face down on the ground, feeling that he was possibly suspect in the homicide.
Q. Did he make any statement to you at all as he was getting out of the vehicle?
MR. GAMMONS: We object to any statements, Your Honor.
THE COURT: Overrule.
Q. Did you ask him any questions as he was getting out of the vehicle?
A. As he was getting out, I said nothing more than just get out of the vehicle and lie face down on the ground.
Q. Did he say anything to you from the time he got out of the vehicle until the time he laid face down?
A. No, sir, not at that time.
Q. What did you do when you got him on the ground?
A. I approached him and I had him spread his arms and his legs out to his side in a manner like this, so I could observe his hands and feet, making sure that he was not armed, as visible as I possibly could, then I started to cuff him.
Q. Did he make any statement then?
A. As I was cuffing him I said do you have a gun?
MR. GAMMONS: We object, Your Honor, to any statements he made at that time.
THE COURT: Overrule.
Q. And what did he say at that time, if anything?
A. He said it’s in the truck.
Q. He said it was in the truck. Were those his exact words?
A. I can’t say exactly what he said, but it was something to that nature.
Q. All right, what did you do then?
A. I proceeded to handcuff him and while I was handcuffing him, he said something in the nature of that’s the one that did it.
MR. GAMMONS: I object, Your Hon- or.
THE COURT: Overrule. Did you ask any questions?
A. The question I asked was did he have a gun.
THE COURT: Other than that?
A. Yes, sir, I can’t remember what I said to him. I might have said something in the nature of is that the one that did it. [Emphasis added.]
We find that .the decision of the Court of Criminal Appeals, holding that Officer Wooten had not begun a “custodial interrogation,” is in error.
In Miranda, supra, the United States Supreme Court defined “custodial interrogation” to mean “questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.” The above quoted statements from the record indicate that the officer dismounted his vehicle “. . . holding his shotgun and, while handcuffing defendant, who was then lying face down on the ground, questioned him.” In this position, there was sufficient restraint on defendant’s liberty for defendant to be considered “in custody” of the police officer. Miranda warnings are required where there has been such a restriction on a person’s freedom as to render him “in custody.” Kelley v. State, 366 So.2d 1145 (Ala.Cr.App.1979). Thus, it was reversible error for the trial court to admit these statements into evi *955 dence since Miranda warnings had not been given defendant prior to the interrogation. Harrison v. State, 358 So.2d 768 (Ala.1978).
We do not mean for this opinion to be construed as holding as a matter of law that a police, officer must always give Miranda warnings prior to asking a suspect if he is armed. We recognize the right of a police officer to ask such a question in the interest of his own and others’ personal safety. See, Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Under the facts in the instant case, it is clear that the defendant posed no threat of harm at the time the crucial questions were asked.
Our reversal, then, is not grounded upon admission of evidence concerning the type of protective action approved in Terry v. Ohio. Rather, our reversal is based upon admission of defendant’s inculpatory response to “custodial interrogation” conducted without a Miranda warning. Crucial to our holding, in addition to the “in custody” aspect of the interrogation, is that the officer went beyond asking whether the defendant was armed to ask whether the weapon was the one used in the commission of the offense.
REVERSED AND REMANDED.
FAULKNER, JONES, SHORES, EM-BRY and BEATTY, JJ., concur.
MADDOX, J., with whom ALMON, J., concurs, dissents.
ON APPLICATION FOR REHEARING OPINION EXTENDED; APPLICATION FOR REHEARING OVERRULED.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).