Bruce Quillon Carroll was indicted for robbery in the first degree in violation of § 13A-8-41, Code of Alabama 1975. The jury found the appellant "guilty as charged" and following a habitual offender hearing, the trial judge sentenced him to life imprisonment in the penitentiary without parole.
On December 9, 1981, at approximately 4:00 p.m., the appellant, Regina Harris Carroll and the appellant's brother, John Carroll, went to Dwight Greene's townhouse. The three drank and listened to music with Greene, his wife and his aunt. At 6:00 p.m., Arthur Le Croix, Greene's next door neighbor, came over to Greene's townhouse. Le Croix left shortly thereafter to go get a haircut and then returned around 8:00 p.m. At approximately 9:00 p.m., the party moved to Le Croix's townhouse. At some point, the appellant asked Greene how well he knew Le Croix. Greene replied they were good friends.
Later, Regina asked Greene privately, "Is it all right with you if I pull him for the ring?" (R. 421). Le Croix was wearing a ring valued at approximately $1600. Greene stated that although he did not know what "pull" meant, he knew "it had something to do with getting Dee's ring." (R. 421). Regina then went and told the appellant, "Dwight said no." (R. 422).
The appellant then asked Greene, "Well, reckon we can get him in a crap game." (R. 422). Regina said, "Hey, he won't remember a thing." (R. 422). Greene said no and went home. The appellant's brother was at Greene's townhouse and Greene told him about the conversation with the appellant and Regina. John Carroll said he would "put them on the road" (R. 425) and left.
At about the same time, Le Croix came back over to Greene's townhouse and asked Greene if he was going to party some more and when Greene said no, Le Croix left. John Carroll returned and left about 10:20 p.m.
Mrs. Greene then went over to Le Croix's apartment and Le Croix was not there. His body was found the next morning in a ditch beside a road near the Morgan County garbage dump. An examination of the deceased's blood did not reveal the presence of alcohol or drugs. However, further testing revealed the presence of Scopolamine in the urine, kidney and lung specimens and in the gastric contents of the body.
A drug expert with the Department of Forensic Sciences stated that Scopolamine could cause drying of the mouth, drowsiness, amnesia, hallucinations, blurred vision, disorientation, excitement, irritability and coma.
The pathologist stated that death was caused by a defective, fatty liver that failed due to the effect of exposure to the cold along with the presence of Scopolamine in the body.
On November 28, 1981, Officer Dennis Young of the Huntland, Tennessee Police *Page 345 
Department, saw the appellant, Regina and another couple back the vehicle in which they were riding into a parking space in Huntland. The two women made several trips into a bar and on the last trip back to the car, they took a chain saw out of a truck. They returned to their vehicle and as the two men were assisting them in putting the chain saw in the trunk, the four were arrested. Four bottles containing Scopolamine were found in the trunk during an inventory search. Another bottle which contained Scopolamine was found in Regina's purse.
On December 14, 1981, Allan Myra Smith met the appellant and Regina at a lounge where he was performing. Smith had approximately five drinks over the course of the night. When he finished playing, he went with the appellant and Regina to their motel room at the Georgian Oaks Motel. The appellant and Regina's automobile was a Delta 88 Oldsmobile with an Alabama license tag.
At the motel, Regina offered Smith a drink which she prepared in the bathroom. Smith drank the drink and the next thing he remembered was waking up at 7:00 the next morning. He stated he had trouble getting his balance, his throat was dry, his vision was blurred, and he was disoriented and hallucinating.
Smith soon discovered he was missing his jacket, boots, belt buckle, car keys and some money. When he got to his car, he found two guitars, two sound systems, a jacket and a microphone were missing.
On December 18, 1981, Kenneth Patterson of Cullman, Alabama, was contacted about a Delta 88 Oldsmobile which had allegedly been involved in an accident at the Georgian Oaks Motel in Marietta, Georgia. Patterson had leased this automobile to Regina earlier that week. The car was returned to his car lot on December 19, 1981.
Authorities found the fingerprints of both the appellant and Regina on contents within the vehicle and a bottle which contained Scopolamine residue.
 I
The appellant contends the trial court erred by admitting evidence of separate, distinct and independent offenses which were allegedly committed by the appellant, to-wit, the appellant was arrested on November 18, 1981 in Huntland, Tennessee and that the appellant was involved in a robbery on December 14, 1981, in Marietta, Georgia.
 "While it is true that evidence of separate crimes is inadmissible where the only probative function of such evidence is to show bad character, or an inclination or propensity to commit the type of crime for which an accused is being tried, if the accused's commission of another crime or misdeed is an element of guilt, or otherwise tends to prove his guilt, then proof of such other crimes is admissible. Sparks v. State, 376 So.2d 834 (Ala.Cr.App. 1979); C. Gamble, McElroy's Alabama Evidence § 69.01 (1) (3rd ed. 1977.)"
Watson v. State, 398 So.2d 320 at 328 (Ala.Cr.App. 1980).
 "All evidence is relevant which throws, or tends to throw, any light upon the guilt or innocence of the prisoner. And relevant evidence which is introduced to prove any material fact ought not to be rejected merely because it proves, or tends to prove that at some other time or at the same time the accused has been guilty of some other separate, independent and dissimilar crime. The general rule is well settled that all evidence must be relevant. If the evidence is relevant upon the general issue of guilt, or innocence, no valid reason exists for its rejection merely because it may prove, or may tend to prove, that the accused committed some other crime or may establish some collateral and unrelated fact."
Allen v. State, 380 So.2d 313 (Ala.Cr.App. 1979).
The appellant contended during arguments that there was not a single evidentiary thread to tie all of these offenses together so that the evidence of the offenses in Georgia and Tennessee should not have *Page 346 
been admitted. We do not agree. There was evidence of the use or possession of Scopolamine in each of these cases. Scopolamine was found in the possession of the appellant after he was arrested in Tennessee. Smith experienced the effects of Scopolamine after he was given a drink by Regina and Scopolamine was found in the car that the two had been driving on that night in Marietta, Georgia. Obviously, these crimes were admitted to show that (1) the appellant had the means (i.e., he had possession of Scopolamine on these two other occasions and used some) and (2) the appellant and Regina had a system or scheme for perpetrating these crimes (drug the victim because he wouldn't be able to remember anything, and then steal anything the two wanted).
Here, the evidence pertaining to the offense in Tennessee was used to show that the appellant had possession of Scopolamine which was used to drug Le Croix, thus making it possible for them to steal his ring. The evidence admitted concerning the offense in Georgia was to demonstrate that the appellant and Regina had used the same method or scheme to rob Smith as they did when they robbed Le Croix.
We hold the evidence of these two crimes was most relevant to the offense charged and therefore the admission of this evidence was proper.
 II
The appellant argues the trial judge erred by refusing to grant defense counsel's motion for change of venue due to the widespread pretrial publicity.
 "There are two situations in which a change of venue is mandated. The first is when the defendant can show that prejudicial pre-trial publicity `has so saturated the community as to have a probable impact on the prospective jurors' and thus renders the trial setting `inherently suspect.' McWilliams v. United States, 394 F.2d 41 (U.S.C.A. 8th Cir. 1968);
 "Dobbert v. Florida, 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977). In this situation, a `pattern of deep and bitter prejudice' must exist in the community. Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751, (1968).
 "The second situation occurs when the defendant shows `a connection between the publicity generated by the news articles, radio and television broadcasts and the existence of actual jury prejudice.' McWilliams v. United States, supra." Nelson v. State, 440 So.2d 1130 (Ala.Cr.App. 1983).
The appellant has produced no evidence of the allegedly extensive pre-trial publicity which surrounded his trial and thus, has failed to demonstrate to this court that he did not receive a fair trial as a result of that publicity.
The appellant's contention that an unbiased verdict could not be expected in his trial due to the knowledge of his case by a majority of the jury venire is unfounded.
The fact that the jury venire had pre-trial knowledge of his case doesn't necessarily mean that they had a preconceived bias against him. Anderson v. State, 362 So.2d 1296 (Ala.Cr.App. 1978). The appellant must show actual jury prejudice. Nelson v.State, supra. He has not done so in this case.
Defense counsel had the opportunity to question the full jury venire about their knowledge of the case and about their ability to serve as impartial jurors. None of the members of the venire gave any indication that he or she could not disregard anything they might have heard about the case, or could not render an impartial verdict based on the evidence presented to them at trial. Newspaper articles, without more, do not establish a right to change of venue. Hopkins v. State,429 So.2d 1146 (Ala.Cr.App. 1983).
 `In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in *Page 347 
criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.'
Irvin v. Dowd, supra. Nelson v. State, supra.
Thus here, we can find no showing or evidence of actual jury prejudice against this appellant and therefore believe the jury rendered their verdict based solely on the evidence presented at this trial.
 "Moreover, the determination of whether or not to grant a motion for change of venue is generally left to the sound discretion of the trial judge because he has the best opportunity to assess any prejudicial publicity against the defendant and any prejudicial feeling against the defendant in the community which would make it difficult for the defendant to receive a fair and impartial trial. Botsford v. State, 54 Ala. App. 482, 309 So.2d 835 (1974), Robinson v. State, 403 So.2d 883 (Ala.Cr.App. 1983), cert. denied, (Ala.S.Ct., 82-582, May 6, 1983)."
Nelson v. State, supra.
Since the decision whether to grant a motion for change of venue is within the sound discretion of the trial judge, we will not review that decision in the absence of gross abuse. There was none shown here.
Therefore, this court holds the appellant's motion for change of venue was properly denied.
 III
The appellant claims a mistrial should have been granted because the prosecution made allegedly improper remarks which prejudiced the appellant's right to a fair trial.
The following occurred during the direct examination of Officer Wayne Kennedy by the prosecution:
 "Q Let me ask you this. In the course of your duties there, did you undertake to investigate or locate the driver of the Alabama license plate DJX-455, this '73 Delta Oldsmobile?
"A Yes, sir, I did.
 "Q What if any efforts did you make to try to locate the driver of this automobile?
 "A Okay. First of all we run a tag check which is standard with our department through NCIC which stands for the National Crime Information Center where you can run tag numbers or vehicle identification numbers or suspects, and through tag numbers were able to get the owner's registration and their names and where they live.
 "Q All right. Did you put Alabama DJX-455 into the computer there that you told the jury about to try to locate the owner?
"A Yes, sir, I did.
 "Q Who was that car registered to when you checked it out on the computer?
"MR. ROBY: We object. It would be hearsay.
"THE COURT: Overruled.
 "A Okay. The vehicle was registered to a Gracie McCafferty of a Decatur, Alabama, address.
"Q Gracie McCafferty in Decatur, Alabama?
"A Yes, sir.
 "Q Did you make any further attempt to locate Gracie McCafferty or did you do anything further to establish the driver or owner of the vehicle that was involved in the accident at the Georgian Oaks Motel in Marietta, Georgia?
"A Yes, sir, I called Mrs. McCafferty.
"Q Did she tell you she still owned the car?
"MR. ROBY: We object.
"THE COURT: I believe I will sustain that.
 "Q Well, were you able to determine if Mrs. McCafferty owned the car or not?
"A Yes, sir, I was. *Page 348 
"Q Was she — did she own the car at that time?
"MR. ROBY: We object to that. It calls for hearsay.
"THE COURT: Sustain it.
 "Q Well, later on did you check with Peek Oldsmobile in Decatur, Alabama, and determine that a lady named Gracie McCafferty had sold —
 "MR. ROBY: We object to this leading of his question.
"THE COURT: I think so. I believe that is —
 "MR. NELSON: Judge, may it please the Court, we intend to offer to prove that through a routine check of an automobile that had been involved in an accident, that we can trace the automobile back to the defendant.
 "MR. ROBY: We object and move at this time for mis-trial. Mr. Nelson is testifying. He couldn't get it on direct so he is testifying, and we move for a mistrial.
 "THE COURT: I will overrule it and will ask the jury not to consider any statement made by any of the attorneys with reference to this or any other bit of evidence except in the immediate way of arguments at the proper time. If you can trace it without — if you can show this without having to show hearsay evidence, then it will be admissible. What somebody told you on the phone or something is not —
 "MR. NELSON: Judge, we don't offer it for the truth of what was told. We offer it to try to trace the automobile down.
 "THE COURT: Well, it's admissible for the purpose, for whatever it would be worth, if you can show that it was traced down to the defendant if there is any evidence there that shows the tracing without hearsay evidence." (R. 393-396).
This court does not agree with the appellant's contention that the prosecutor's statements prejudiced his right to a fair trial. First of all, the remarks made by the prosecutor which are referred to us by the appellant seem to be more in the form of an offer of proof rather than an improper comment to the jury.
Secondly, the trial court immediately instructed the jury to disregard any statements made by the prosecutor as argument.
 ". . . [T]he general rule is that prejudicial statements, even though improper, are considered capable of being eradicated by the trial judge in sustaining objections thereto or by appropriate instructions to the jury or both. Allred v. State, supra; Dunn v. State, 277 Ala. 39 at 44, 166 So.2d 878 (1964); Bachelor v. State, 216 Ala. 356, 361, 113 So. 67 (1927); Anderson v. State, 209 Ala. 36, 44, 95 So. 171 (1922)." (Emphasis added).
Meredith v. State, 370 So.2d 1075 (Ala.Cr.App.), writ denied,370 So.2d 1079 (Ala. 1979); Miller v. State, 431 So.2d 586
(Ala.Cr.App. 1983).
Thirdly, "[a] trial court's ruling on a motion for mistrial is reviewable on appeal. Stennett v. State, Ala., 340 So.2d 65
(1976). However, such a motion is addressed to the sound discretion of the trial judge, and his ruling will not be reversed in the absence of a clear showing of abuse of discretion. Shadle v. State, 280 Ala. 379, 194 So.2d 538
(1967); Heard v. State, Ala.Cr.App., 351 So.2d 686 (1977)."Favor v. State, 389 So.2d 556 (Ala.Cr.App. 1980); Washington v.State, [Ms. 6 Div. 23, May 31, 1983] (Ala.Cr.App. 1983). See also Retowsky v. State, 333 So.2d 193 (Ala.Crim.App. 1976).
We can find no such abuse in this case. Therefore, the trial judge's denial of the appellant's request for a mistrial was not error.
 IV
The appellant's claim that the evidence in this case was insufficient to sustain his conviction and therefore, his motion to exclude, motion for new trial and motion for a directed verdict of acquittal should have been granted, is also without merit.
Even though the appellant's conviction rests largely, if not almost entirely on circumstantial evidence, it has long been *Page 349 
established that circumstantial evidence may be used to sustain such a conviction. Cumbo v. State, 368 So.2d 871 (Ala.Cr.App. 1978).
 "In reviewing a conviction based on circumstantial evidence, this court must view that evidence in the light most favorable to the prosecution. The test to be applied is whether the jury might reasonably find that the evidence excluded every reasonable hypothesis except that of guilt; not whether such evidence excludes every reasonable hypothesis but guilt, but whether a jury might reasonably so conclude." (Citations omitted).
Cumbo v. State, supra.
We have examined this record and hold there was, in fact, sufficient legal evidence presented at trial from which the jury could conclude, by fair inference, that the appellant was guilty of the offense charged beyond a reasonable doubt.
Therefore, for the reasons stated above, the judgment of the trial court is due to be and is hereby affirmed.
AFFIRMED.
All the Judges concur. *Page 559